
CLERK'S OFFICE
A TRUE COPY
Feb 23, 2026
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original      ☐ Duplicate

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| **Two Cellular Phones, as More Particularly Described in Attachment A** | )    Case No.      26-MJ-45 ) ) ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the    Eastern    District of    Wisconsin

*(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before    03/09/2026    *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    Magistrate Judge William E. Duffin    .

*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*    ☑ until, the facts justifying, the later specific date of    08/22/2026    .

Date and time issued:    02/23/2026 at 10:10 a.m.

*Judge's signature*

City and state:    Milwaukee, WI        Magistrate Judge William E. Duffin

*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## **ATTACHMENT A**

*Property to Be Searched*

The property to be searched consists of two cellular phones presently securely stored in the evidence processing room of HSI's Milwaukee Field Office located at 790 N. Milwaukee Street, #600 in Milwaukee, Wisconsin. Those devices are described more particularly as:

a. A pink iPhone with the cellular number XXX-XXX-5375 and the username "Sam Rodriguez;" and

b. A blue iPhone with cellular phone number XXX-XXX-2299 and the username "Samantha Casilla."

# ATTACHMENT B

## *Property to be Seized*

All evidence, instrumentalities, information, records, and contraband relating to violations of Title 18, United States Code, Section 2421(a) (interstate transportation for prostitution); Sections 1591(a)(1) and (b)(1) (Sex Trafficking by Force, Fraud or Coercion); Title 8, United States Code, Sections 1324(a)(1)(A)(ii)-(iii) and (B)(i) (transportation and/or harboring of aliens for financial gain); and Title 8, United States Code, Section 1328 (important of aliens for an immoral purpose), including but not limited to:

1. Electronic communications, including text messages, instant messaging applications (such as WhatsApp); audio or video-recorded messages; emails; and other forms of written messages concerning prostitution, sex trafficking, alien smuggling, harboring or transportation, and/or any targets, potential victims or potential co-conspirators of the crimes under investigation;

2. All images or videos relating to advertisements for or communications about commercial sex acts, or of potential victims of sex trafficking;

3. Any GPS location information and/or data from maps applications that will indicate the user's location during the dates under investigation, the user's presence at any of the locations under investigation, and any other affiliated prostitution venues elsewhere;

4. All call logs;

5. All contact lists, to assist with the interpretation of the communications documented in the call logs and text messages; and

6. All evidence of user attribution, showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, notes, documents and Internet browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2

CLERK'S OFFICE
A TRUE COPY
Feb 23, 2026
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. 26-MJ-45 |
| Two Cellular Phones, as More Particularly Described in Attachment A | ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the **Eastern** District of **Wisconsin** , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2421(a) & 1591 ; 8 U.S.C. §§ 1324 & 1328 | interstate transportation for prostitution; Sex Trafficking by Force, Fraud or Coercion; transportation and/or harboring of aliens for financial gain; and important of aliens for an immoral purpose |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of __180__ days *(give exact ending date if more than 30 days:* __08/22/2026__ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ian House, Special Agent, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by __telephone__ *(specify reliable electronic means)*.

Date: __02/23/2026__

_____
*Judge's signature*

City and state: __Milwaukee, WI__

Magistrate Judge William E. Duffin
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF AN
# APPLICATION FOR SEARCH WARRANT

I, Ian J. House, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with Homeland Security Investigations and have been since 2008. Homeland Security Investigations (HSI), under Immigration and Customs Enforcement (ICE), comprised of the former United States Immigration and Naturalization Service (INS) and United States Customs Service.

2.      I am currently assigned to the HSI Office of the Resident Agent in Charge (RAC) in Milwaukee, Wisconsin. As a Special Agent with HSI, I am authorized to investigate violations of the criminal and administrative laws of the United States, and as a law enforcement officer for the United States, I am empowered by law to conduct investigations of, and to make arrests for, federal offenses.

3.      Since 2011, I have worked with the Greater Milwaukee Human Trafficking Task Force and the Wisconsin Anti-Human Trafficking Task Force since 2022. In my current employment, I am assigned to investigate alleged violations of the Immigration and Nationality Act (INA) and human trafficking offenses. This includes the enforcement of laws prohibiting human trafficking, human smuggling, conducting immoral acts across state boundaries, narcotics distribution, and money laundering.

4.      I have received training on sex crimes, human trafficking,

1

narcotics investigations, money laundering, financial investigations, and various other violations of federal law that fall under the purview of HSI. I have participated in numerous investigations involving violations of state and federal laws. I have participated in, authored, or assisted in numerous federal search warrants for narcotics, firearm, and human trafficking related offenses that have resulted in the seizure of controlled substances, firearms, and United States currency from individuals involved in trafficking.

5.     I have debriefed multiple defendants, informants, and witnesses who had personal knowledge regarding major trafficking organizations. I am familiar with the ways in which traffickers conduct their unlawful trafficking activity, including, but not limited to, their methods used to distribute, transport, store, and import subjects or products, their use of code words and numbers to conduct their transactions, their methods for concealing and safeguarding products and proceeds, their methods used to launder proceeds, and their use of violence and threats of violence to protect their organization. I have also conducted physical and electronic surveillance and analyzed electronic evidence. I am familiar with traffickers' methods of operation including communications via Facebook messenger, electronic telephone/smart phone applications, text messaging services, and other traditional forms of communications. I know that individuals involved in trafficking operate vehicles in facilitation of trafficking activities, and I know that monitoring of such vehicles has resulted in identification of co-conspirators, patterns of travel, and relevant locations to include storage and

2

distribution locations.

6.     I make this affidavit in support of an application for a warrant issued under Federal Rule of Criminal Procedure 41 authorizing a search of the two cellular phones identified below (hereinafter "THE DEVICES") and further described in Attachment A:

    a. A pink iPhone with the cellular number XXX-XXX-5375 with the username of "Sam Rodriguez;" and

    b. A blue iPhone with cellular phone number XXX-XXX-2299 with the username of "Samantha Casilla."

Both DEVICES are presently securely stored in the evidence processing room of HSI's Milwaukee Field Office located at 790 N. Milwaukee Street, #600 in Milwaukee, Wisconsin.

7.     Based on the facts set forth in this affidavit, I believe that THE DEVICES contain evidence of violations of Title 18, United States Code, Section 2421(a) (interstate transportation for prostitution); Sections 1591(a)(1) and (b)(1) (Sex Trafficking by Force, Fraud or Coercion); Title 8, United States Code, Sections 1324(a)(1)(A)(ii)-(iii) and (B)(i) (transportation and/or harboring of aliens for financial gain); and Title 8, United States Code, Section 1328 (important of aliens for an immoral purpose); and that there is probable cause to believe that the contents of THE DEVICES will lead to the discovery of additional evidence, fruits, and instrumentalities of the aforementioned crime, as well as to the identification of individuals who are engaged in the commission of those and related crimes.

8.     The facts in this affidavit come from law enforcement officers'

3

observations, confidential informant information, training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Throughout this affidavit, reference will be made to case agents or investigators. Case agents or investigators are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom I have had regular contact regarding this investigation.

9.    The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated.

**PROBABLE CAUSE**

A. **Origins of the Investigation and CI-1**

10.    The United States, including Homeland Security Investigations (HSI), City of Milwaukee Police Department (MPD), Federal Bureau of Investigation (FBI), Drug Enforcement Administration (DEA), and other agencies are conducting a criminal investigation into Evelyn Llanos Llanos (DOB XX/XX/1973), Nadia Perez Ortega (DOB XX/XX/1985) (hereinafter "**The Targets**"), and others regarding the offenses set forth in paragraph 2 above.

11.    This investigation arose in March of 2025 when a Confidential Informant (hereinafter CI-1) notified investigators about a residence that was being operated by two females, later identified as **the Targets**, as a brothel or

4

venue for prostitution, with two new foreign national females arriving every week to perform commercial sex acts there.

12. CI-1 has been providing information to law enforcement agents for approximately one year, much of which has been corroborated by law enforcement through independent investigations. CI-1 has no criminal convictions. CI-1 is cooperating in exchange for third party consideration for another subject with a pending felony case. CI-1 is also cooperating in exchange for immigration benefits, including Deferred Action and Employment Authorization status. CI-1 has also conducted controlled buys of narcotics for law enforcement. Coupled with information provided by the CI-1, this cooperation has resulted in multiple arrests and convictions of narcotics traffickers. Case agents believe CI-1 is credible and that the information provided by CI-1 included in this affidavit is reliable.

13. CI-1 first provided information regarding prostitution activity at a residence at 22XX W. Greenfield Avenue in Milwaukee, Wisconsin. **The Targets** next moved their prostitution activity from to 48XX N. Elkhart Avenue in Whitefish Bay, Wisconsin. CI-1 was told the move was due police presence in the area of the West Greenfield Avenue residence. **The Targets** then moved from Whitefish Bay back to Milwaukee, specifically a house located at 22XX S. 15th Place. CI-1 advised this move was due to the reduction of in-house prostitution clientele in Whitefish Bay. As of late 2025, CI-1 has advised that **the Targets** have returned to using 22XX W. Greenfield Avenue.

14. According to information provided by CI-1, corroborated by

investigative techniques used by case agents, although the location of **the Targets'** operations has changed periodically, their criminal objectives and methods have remained largely the same.

15. CI-1 first learned about **the Targets'** brothel by word of mouth. CI-1 was told that one must be invited to the house by someone who has been there before. CI-1 met a subject who had been there before and was able to enter the residence, where CI-1 met with a Hispanic female with a dark complexion, later identified as Evelyn Llanos-Llanos (DOB XX/XX/1973). Llanos Llanos asked for CI-1's phone number. Llanos Llanos then sent CI-1 advertisement photographs of the females who were available at the residence for commercial sex acts. Llanos Llanos sent these messages via WhatsApp using a phone number with last four digits -9999, hereinafter referred to as "Target Phone 1."

16. In April of 2025, CI-1 provided law enforcement with photographs of **the Targets** that CI-1 was able to take inside the house on 48XX N. Elkhart Avenue in Whitefish Bay. Additional photographs taken during surveillance in March and April at 22XX W. Greenfield Avenue and 48XX N. Elkhart Avenue, along with identification of the vehicles **the Targets** were using, contributed to the identification of **the Targets**. CI-1 positively identified photographs of both **Targets** as the two subjects who are running the prostitution business.

17. CI-1 reported that **the Targets** drive different females every week to the brothel locations. The females remain there for approximately one week to perform commercial sex acts. CI-1 indicated that new females arrive every

6

Monday and leave the following Saturday. CI-1 further explained that after approximately one week, the females are swapped out for new females. CI-1 stated none of the females CI-1 had observed spoke English.

18.     CI-1 stated that once the new females arrive for the week, **the Targets** send a message via WhatsApp from Target Phone 1 to their vetted clients. Only the clients who are using the women's services regularly receive the photographs. If a client has not used the services regularly, the client must request that photographs be sent to them. CI-1 stated the clients would also receive updates about the brothel's operation from **the Targets** via WhatsApp, including hours of operation, dates and times when the brothel would not be open for business, and when the operation was moving to a new location.

19.     Throughout this investigation, CI-1 has provided investigators with copies of the texts sent by **the Targets** advertising the females' availability for commercial sex dates. Photos included in the messages depict the females dressed in lingerie or short dresses and posed provocatively. Some of the advertisement pictures have captioning indicating where the females are from, including Brazil, Mexico, Venezuela, Columbia, and Puerto Rico. Some also include their ages.

20.     CI-1 explained that to set up dates with the women at the brothel, a client sends a text message to **the Targets** in advance to set up a visit and negotiate a price for a sex act. When the client arrives, **the Targets** have the available females line up for the client. The client then selects a female and

pays one of **the Targets** the amount set in cash. CI-1 stated the charge is normally about $120 for an hour incall.

21.     CI-1 stated that all payment for sexual services is given to **the Targets** and not to the females performing the sex acts. CI-1 stated one of the clients told CI-1 that he once paid a female directly, but as the client was leaving, he saw the female hand the money over to the "boss lady." The subject's description of the boss lady matched the description of Llanos Llanos.

22.     CI-1 stated that in addition to hosting prostitution activity, **the Targets** also drive the girls to "outcalls," or commercial sex dates at customers' locations. CI-1 stated that outcalls have different prices than incalls at the houses run by **the Targets**.

B. **Observations by Law Enforcement**

23.     Extensive surveillance has been conducted at each new brothel location throughout the course of this investigation, and **the Targets** have been observed frequently exiting an entering each location alone or in the company of the females being advertised that week. At present, **the Targets** continue to be observed operating out of 22XX W. Greenfield Avenue in Milwaukee.

24.     Case agents have also conducted surveillance of **the Targets** on the road whenever possible. Case agents have identified two vehicles being used by **the Targets** in furtherance of the crimes under investigation. Both are registered to Evelyn Llanos Llanos (XX/XX/1973) at the address of 26XX S. 70th Street, Apartment X, in Milwaukee, according to a Wisconsin Department

of Motor Vehicles records check.

25. On October 27, 2025, case agents obtained search warrants to install and monitor GPS tracking devices on the Subject Vehicles from the Honorable Magistrate Judge Stephen Dries in the Eastern District of Wisconsin. Those warrants were extended on December 8, 2025, and January 22, 2026, and GPS tracking of the vehicles continues at present.

26. Case agents have continually monitored the movements of the Subject Vehicles since the tracking devices were first installed, and they have also conducted physical surveillance on the vehicles around the City of Milwaukee and elsewhere. They have observed that the Subject Vehicles are almost always driven by Llanos Llanos. Each day, the Subject Vehicles make frequent 15-to-60-minute stops at various residential locations, and the women being advertised for sex dates have often been seen entering and exiting the Subject Vehicles at these locations. The Subject Vehicles also sometimes drop the women off and later pick them up from hotels, where the women are sometimes seen being escorted into hotel rooms by men. In my training and experience, this type of activity is consistent with outcall commercial sexual services.

27. Case agents and other law enforcement officers have also conducted traffic stops of the **Targets** wherein they have been observed transporting the women depicted in the WhatsApp commercial sex advertisements.

28. One such traffic stop occurred on September 16, 2025. The Oak Creek Police Department conducted a traffic stop of Llanos Llanos' silver Kia

9

Soul (hereinafter "Subject Vehicle 1") at S. 22nd Street and W. Ryan Road for failure to stop at a crosswalk. Subject Vehicle 1 was seen leaving the Value Inn, located at 9420 S. 20th Street prior to the moving violation. The traffic stop revealed that Llanos Llanos was the driver, Perez Ortega was in the front passenger seat, and a female who was depicted in WhatsApp commercial sex advertisements sent by the **Targets** the day prior was the rear seat passenger. This female was identified as a Venezuelan national with an application for a pending immigration status and a valid work authorization card. Her most recent address is in Wood Dale, Illinois. AF-1 has been linked through her phone number to other prior law enforcement investigations regarding offenses similar to the subject offenses in this case.

29.     Throughout the period during which case agents have been conducting surveillance, none of the advertised women have been observed leaving the house without one or both **Targets**. Additionally, none of the women in the advertisements have been observed driving the Subject Vehicles. It appears the women are escorted by **the Targets** everywhere they go, consistent with alien harboring and/or sex trafficking.

30.     On weekends, **the Targets** use the Subject Vehicles to pick up and drop off the women both within the State of Wisconsin and outside of it, "exchanging" females who have been performing commercial sex dates for the past week for new ones who will perform commercial sex dates during the upcoming week.

31.     Over the course of this investigation, the Subject Vehicles have

been tracked and captured on digital surveillance traveling through multiple different states, including Wisconsin, Illinois, Indiana, Michigan, Ohio, Connecticut, and New York.

32. When they drive, **the Targets** appear to be implementing countersurveillance measures, including ensuring quick transfers of the women by arranging the details in advance via phone, scoping areas out before stopping or parking, avoiding areas with known cameras, evasive driving maneuvers meant to lose anyone who may be following them, and periodic switching between the Subject Vehicles.

33. Physical and electronic tracking and surveillance of **the Targets** and the Subject Vehicles, combined with review of the weekly advertisements, has led to the identification of at least sixteen foreign national women whom **the Targets** have transported into and out of the Eastern District of Wisconsin with the intent that they engage in acts of prostitution.

34. Commonalities have emerged concerning the women who have been identified thus far. While they have varying legal statuses—from undocumented, to pending immigration applications, to orders of removal, to lawful permanent resident status—all of those who have been identified are from countries and territories in Latin America, including Venezuela (8), Mexico (2), the Dominican Republic (2), Colombia (2), Honduras (1), and Puerto Rico (1).

35. None of the women have known ties to the State of Wisconsin, and their addresses in law enforcement databases are in other states, including

11

Illinois, New York, Massachusetts, and Florida. Based on surveillance and other investigative techniques, the women enter and leave the Eastern District of Wisconsin via different methods, including by Greyhound bus, transportation by private vehicles with out-of-state plates, and by commercial airlines. **The Targets** have been seen each Monday picking the women up from transportation hubs like the Milwaukee Intermodal Station or in parking lots where they meet with other private vehicles, then dropping them off in the same locations on Saturdays. On occasion, **the Targets** themselves have been seen driving the women out of state.

36. At least half of the women have phone numbers or confirmed associations with other individuals tied to human trafficking, gang, and/or drug investigations headed by HSI in other states. Case agents have contacted investigators in other districts and learned that over the last 10 years, many of them have been aware of very similar brothels operating in residential neighborhoods with pairs of women arriving and departing each week. Based on patterns of travel and phone communications, there is probable cause to believe that these brothels operate as cells within a larger network and that the women who perform commercial sex acts in the Eastern District of Wisconsin at **the Targets'** direction then move on to work for other subjects within the same network in other states.

37. Based on surveillance and subpoenaed records, case agents have been able to identify financial institutions **the Targets** and the women under their control have frequented to deposit cash proceeds from their illicit

12

activities. Most frequently, they have been observed traveling to a Bank of America branch in northern Illinois to deposit cash into several accounts (including accounts held in their own names) using an ATM.

38.     Subpoenaed records show that after this cash is deposited, **the Targets** and the women transfer a substantial portion of those funds using CashApp and other peer-to-peer financial applications to accounts held in the names of various Venezuelan nationals and businesses. The identities of the account holders and links between them are still under investigation.

**C. January 31, 2026, Interview of Immigration Detainee**

39.     On January 30, 2026, I was notified by a law enforcement partner that Immigration and Customs Enforcement, Enforcement and Removal Operations in Milwaukee had detained a Mexican national who had been ordered removed from the United States. The detainee, referred to hereinafter as SOI-1, was in custody at the Waukesha County Jail. SOI-1 was offering information relating to sex trafficking and narcotics trafficking operations in Milwaukee.

40.     SOI-1 is a Mexican citizen and national who was encountered by Immigration and Customs Enforcement-Enforcement and Removal Operations (ERO) officers while he was incarcerated on criminal charges. It was determined that SOI-1 had been ordered removed from the United States by an immigration judge in 2013 but failed to depart, and he was consequently deported on or about February 3, 2026. Queries of law enforcement databases showed that SOI-1 has a criminal history, to include state charges for

possession of narcotics, retail theft, operating without a valid license, theft of movable property.

41. On January 31, 2026, SOI-1 consented to be interviewed by law enforcement about his knowledge about various criminal activities on the southside of Milwaukee, including interstate prostitution, sex trafficking and narcotics trafficking. SOI-1 also consented to law enforcement imaging his cellphone. At the time of these interactions, he was not given or offered any benefit in exchange for the information he provided.

42. Law enforcement has continued to communicate with SOI-1 following his removal from the United States, and he has continued to provide information that case agents believe to be truthful and accurate based on their training and experience and the other information and evidence available to date.

43. SOI-1 disclosed that he has exchanged money for sex acts at **the Targets'** brothel on several occasions prior to being taken into custody and had connected several of the employees and customers of his contracting business to the brothel managers. He admitted that he acted as a "middleman" for them to broker dates. He recalled that he first received the WhatsApp phone number for the commercial sex advertisements from someone he identified as "Tulio," a Venezuelan national who rents a residence near the house where SOI-1 lived prior to his arrest. Tulio's house was owned by the same landlord SOI-1 rented from. SOI-1 identified Tulio as a drug trafficker who sells cocaine.

44. SOI-1 was shown photos of Evelyn Llanos Llanos and Nadia Perez

14

Ortega (**the Targets**). He did not recognize them, however records from a pen register on Target Phone 1 showed that the phone number he provided to ERO officers and HSI was in contact with the number for Target Phone 1 (Llanos Llanos and Perez Ortega) over 900 times in the last year.

45. Prior to his arrest, SOI-1 was a regular recipient of the WhatsApp commercial sex ads sent by **the Targets**, as described above. An initial review of the image of SOI-1's cellphone revealed a back-up of the device that had WhatsApp ad messages from **the Targets** going back to at least December of 2024.

46. SOI-1 was also shown a series of photos of women whom case agents have identified from prostitution advertisements circulated by **the Targets**. Without hesitation, SOI-1 identified a woman referred to in other search warrant affidavits in connection with this investigation as AF-2 one of the women he has obtained sexual services from in the past. AF-2 is a Venezuelan national with a pending application for immigration status in the United States who has an address in Chicago, Illinois. AF-2 has been identified as connected to a 2024 Dallas-based investigation into offenses and conduct similar to what is under investigation in this case, also believed to involved TDA.

47. SOI-1 explained that if the women at the brothel felt comfortable with a customer, they would disclose more private information. SOI-1 said that while the women pretended or feigned enjoying conducting prostitution dates, SOI-1 knows that is not true. According to SOI-1, he was able to become a

15

trusted person for AF-2 and she began to confide in him. AF-2 disclosed to him that she is being forced to engage in prostitution against her will because the Tren de Aragua gang smuggled her into the United States, and now she owes them a debt.

48.     I am aware that Tren de Aragua (TDA) is a violent transnational criminal organization that originated in Venezuela. Members often are intricately involved in human smuggling, human trafficking, narcotics trafficking, money laundering, kidnapping, theft, arms trafficking, murder, extortion, and bribery. Most countries in Central and South America reported to have members within their countries that are attempting to create a permanent foothold to expand their criminal enterprise. Several countries, including the United States, consider TDA a "Foreign Terrorist Organization" due to the international reach of the criminal organization.

49.     SOI-1 said that in his experience, the border crossing debt for most of the women who work for the brothel is usually $15,000 USD. He also said that the women are required to repay their debts by performing commercial sex acts and earning no less than $1,500 per day. SOI-1 said these victims' debts could also theoretically be repaid by a third party so that the victims could stop doing dates and be free of the organization. SOI-1 indicated that in practice, however, it was impossible for the women to repay their debts. In my training and experience, this practice is called debt bondage. Fees and additional expenses are continually added to their debts, and they are told they have no choice but to continue to engage in prostitution to repay the debt. Any costs

16

incurred by a trafficker are passed on to the victims, often in ways that are not transparent or that inflate the actual costs. Traffickers also typically are not transparent with victims about how much they have earned or how much their debts have been paid down.

50.     The SOI-1 said that there are also TDA "hitmen" in Milwaukee to ensure the women continued to conduct prostitution dates for the TDA. He said that these hitmen would drive women to their dates, negotiate the terms and price for the date, and set a timer for the agreed-upon time. When the time is almost out, the hitmen would alert the victims that time is almost up. These hitmen would also force the victims to complete dates. If a victim refused for an unapproved reason (something other than the client refusing to pay or being highly intoxicated), the hitmen would physically assault the victim with a paddle. SOI-1 said that if this continued to happen, these hitmen would make an example out of the victim by killing her and disposing of her body in Lake Michigan. SOI-1 claimed Tulio has told him that many women had been killed in this manner for failure to perform prostitution dates as expected. SOI-1 also reported being told by Tulio that a security guard from El Rey Supermarket was killed in this same manner by the TDA hitmen.

**D. Identification of MAURICO COREDRO and Seizure of THE DEVICES**

51.     In the early morning hours of November 13, 2025, law enforcement partners were monitoring the travel of **the Targets**, who were en route from Connecticut to Milwaukee via I-80 eastbound through the State of Indiana in Subject Vehicle 1. Case agents alerted Indiana law enforcement officers of the

17

investigation and the vehicle's route through their state. At approximately 5:24 a.m., an Indiana sheriff's deputy observed Subject Vehicle 1 make an unsafe lane deviation and initiated a traffic stop approximately three miles from the border between Indiana and Michigan. The Indiana deputy identified Llanos Llanos as the driver of the vehicle and Perez Ortega as the front seat passenger. The deputy stated that Llanos Llanos claimed not to speak English. The deputy obtained identification for the two females in the rear seats. One of the two, was identified as Masdelin MAURICIO CORDERO based on her Dominican passport.

52.     Later that morning, around 8:36 a.m., Subject Vehicle 1 arrived back at 22XX S. 15th Place in Milwaukee. A few hours after that, CI-1 contacted case agents to inform them that a new ad had been sent to the WhatsApp client group by **the Targets**. One of the photos was of the second female who was observed in the rear passenger's seat of the Subject Vehicle next to MAURICIO CORDERO. The face of the other female being advertised that day was obscured in the photos. Based on my involvement with this investigation, I know that it is the regular practice of **the Targets** to advertise the two new females each week by sending photos of them as soon as they arrive in Milwaukee. I also know it is the regular practice of **the Targets** to receive both new women on the same date and to transport them to the brothel using the Subject Vehicle. Based on these practices, there is probable cause to believe that MAURICIO CORDERO was the second female advertised that week.

53.     MAURICIO CORDERO is a lawful permanent resident of the United

18

States who was born in the Dominican Republic and who has an address in New York and ties to Pennsylvania, including a prior arrest in Pennsylvania in 2023 and documented travel to and from that state. She has been known to travel between the United States and the Dominican Republic.

54. During one of MAURICIO CORDERO's recent return flights to the United States, she was selected for a secondary inspection by Customs and Border Protection (CBP) because of her previous narcotics-related arrest by FBI Pittsburgh. MAURICO CORDERO stayed in the inspection area, while a male traveling with her, Brandon Bruno, whom she identified as her boyfriend, was not selected. The bags MAURCIO CORDERO had in her possession at the time of the inspection, which she claimed were Bruno's, were examined with negative results. MAURICIO CORDERO claimed to CBP agents that she had traded bags with him because hers was too heavy for her to manage while waiting in line to speak to a CBP officer. CBP agents discovered that Bruno had carried one of MAURICIO CORDERO's bags out of the inspection area and requested that he return to the inspection area with the bag. Although he returned, he returned without the bag, which was never recovered. When CBP agents asked MAURICIO CORDERO and Bruno questions about what had happened to the bag, they became verbally combative and uncooperative. It was therefore believed that there was something within the unrecovered bag that MAURICIO CORDERO and Bruno did not want discovered by law enforcement.

55. In late January 2026, I learned that MAURICIO CORDERO had

19

purchased a ticket to fly to the Dominican Republic on January 30, 2026, and that she had a return ticket to enter the United States via Newark Liberty International Airport on February 18, 2026. I subsequently confirmed that MAURICIO CORDERO flew to the Dominican Republic on January 30 as planned.

56. MAURICIO CORDERO also returned to the United States through Newark as planned on February 18. At that time, she was again taken aside for a secondary inspection by CBP. MAURICIO CORDERO was asked what she had been doing while she was abroad. She answered that she underwent a plastic surgery procedure, which she briefly described. Based on comparisons of photos over time, it appears most of the potential victims advertised by **the Targets** have undergone at least one plastic surgery. Based on my training and experience, this may be to make them appear more attractive to commercial sex customers and to increase their earning potential, which would benefit **the Targets** and their co-conspirators.

57. As part of their secondary inspection, CBP agents asked MASDELIN CORDERO whether she had any cellular phones with her. She produced a pink iPhone (hereinafter "DEVICE A"), which she unlocked and turned over to the CBP agents. Before she did, however, the CBP agents noticed that she spent a few moments rapidly clicking something unseen on the screen of DEVICE A.

58. After MASDELIN CORDERO handed DEVICE A to the CBP agents, they conducted a border search of her baggage. At that time, CBP agents

located a second cellular phone, a blue iPhone (hereinafter "DEVICE B") that MASDELIN CORDERO had not identified when asked whether she had any cellular phones. This raised CBP's suspicions that there might be contraband or evidence of illegal activity on the phone.

59. Both of THE DEVICES were then taken into another room and subjected to a cursory manual inspection by HSI agents on site at Newark Liberty International Airport. The inspection lasted approximately 30 minutes. HSI agents noted that the phone number connected to DEVICE A was a number ending in -5375 and the phone number connected to DEVICE B was a number ending in -2299. During her encounter with CBP agents, MAURICIO CORDERO was asked her phone number. She provided the number connected to Device A (ending in -5375), as well as a phone number that ended in -5936. She did not give the number ending in -2299 connected to DEVICE B.

60. I have searched all three of these numbers across several pen registers that have been authorized related to this investigation and found that the phone number connected to DEVICE B (ending in -2299) was in contact with a phone number used by **Target** Llanos Llanos 26 times between January 31 and February 1, 2026. Additionally, DEVICE B was also in contact with another potential victim from the Dominican Republic who has been identified as traveling to Milwaukee to engage in commercial sex acts for the **Targets**. MAURICIO CORDERO had contact with that woman's number 170 times between January 28 and February 18, 2026.

61. HSI agents noticed that while DEVICE A had WhatsApp installed,

the account was logged out. Based on the actions observed by the CBP agents who conducted the secondary inspection, I believe MAURICIO CORDERO may have logged out in the moments before she handed DEVICE A to them. DEVICE A was noted to have an application called Telegram installed. Telegram is a cloud-based messaging application and social media platform that allows group chats and the option for end-to-end encrypted "secret chats." This account was also logged out when CBP agents received DEVICE A.

62. DEVICE B also had WhatsApp installed, and an account was still logged in to the app. CBP agents found the contacts with Llanos Llanos on this DEVICE, which included WhatsApp messages containing voice recordings. These were in Spanish and have not been translated. The examining HSI agents also noted several photos of large amounts of currency in bundles laying on a bed, estimated at tens of thousands of dollars in each photo.

63. Based on my training and experience, WhatsApp is a common method of communication used by foreign nationals and travelers to communicate with people in the United States, or vice versa, due to the fact that users are not charged for either international or domestic communications. I also know from this investigation that WhatsApp is used by **the Targets**, the clientele of the brothel, and the women who perform commercial sex acts there.

64. Based on the brief border searches of MAURICIO CORDERO's phones conducted by CBP, there is probable cause that THE DEVICES were using WhatsApp in this way. Additionally, based on the fact that the phone

22

MAURICIO CORDERO voluntarily provided was signed out of WhatsApp, while the phone located in her baggage was not, I believe MAURICIO CORDERO did not want law enforcement or immigration authorities to see the content of her WhatsApp conversations.

65. After CBP and HSI's secondary inspection of MAURICIO CORDERO, I spoke with the Newark agents by phone and received the details recited above. I requested at that time that they detain THE DEVICES and send them to me overnight so that I could pursue the instant warrant. I received the devices today. THE DEVICES were properly stored in airplane mode in Faraday bags from the moment of seizure and throughout their transit to the District. They are presently securely stored in HSI Milwaukee's evidence processing room to prevent spoliation, degradation or other alternation of the evidence.

66. Based on the investigation to date, there is probable cause that THE DEVICES contain evidence of the crimes under investigation, including but not limited to records of communications with **the Targets** and other co-conspirators or victims, evidence of MAURICIO CORDERO's movements, to include other her travels to other connected brothel locations and the dates and times when she visited these locations, and contact information for other known and unknown members of the criminal organization.

## TECHNICAL BACKGROUND

67. As described above and in Attachment B, the warrant applied for would authorize the copying of electronically stored information from THE DEVICES under Rule 41(e)(2)(B).

68.     Based on my training, experience, and research, I know that modern cellular devices, like THE DEVICES this warrant seeks to examine, have capabilities that allow them to serve as a wireless telephone, a digital camera, a portable media player, and a GPS navigation device, among others. In my training and experience, examining data stored on a device of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

69.     I submit that there is probable cause to believe that evidence of the crimes under investigation will be stored on THE DEVICES for at least the following reasons:

    a.     Based on my knowledge, training, and experience, I know that electronic data and files or remnants of such data or files can be recovered months or even years after they have been downloaded onto a cell phone, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when data or files have been deleted, they can be recovered months or years later using forensic tools. This is so because even when it is deleted, the data does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.     Therefore, deleted data or files, or remnants of deleted data or files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.

    c.     Wholly apart from user-generated files, cell phones contain electronic evidence of how those phones have been used, what they have been used for, and who has used them. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

70.     As further described in Attachment B, this application seeks permission to locate not only data and files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence

24

that establishes how THE DEVICES were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on THE DEVICES because:

    a.    Data on the cell phones can provide evidence of data or files that were once on the phones but have since been deleted or edited. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the cell phone was in use.

    b.    As explained herein, information stored within a cell phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage media, include cell phones (*e.g.*, communications, images, transactional information, records of session times and durations, and Internet history) can indicate who has used or controlled the electronic storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. Further, cell phone activity can indicate how and when the cell phone was accessed or used. Such information allows investigators to understand the chronological context of electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a cell phone may provide crucial evidence relating to the physical location of other evidence and suspects. For example, images stored on a cell phone may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media. Last, information stored within cell phones may provide relevant insight into the user's state of mind as it relates to the offense under investigation.

    c.    A person with appropriate familiarity with how a cell phone works can, after examining this forensic evidence in its proper context, draw conclusions about how the cell phones were used, the purpose of their use, who used them, and when.

d. Further, in finding evidence of how a cell phone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is *not* present. For example, the presence or absence of anti-virus programs or malware (and associated data) may be relevant to establishing user attribution and intent.

71. In most cases, a thorough search for information that might be stored on cellular phones requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the site of a search, it is sometimes possible to make an image copy of the storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to review the loss of the data either from accidental or intentional destruction.

72. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit imaging or otherwise copying THE DEVICES and a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose it to human inspection in order to determine whether it is evidence described by the warrant.

## AUTHORIZATION REQUEST

73. The evidence gathered to date, including from physical and digital surveillance of **the Targets,** information from CI-1 and SOI-1, and subpoenaed records has established probable cause for the offenses under investigation, as

26

listed above in paragraph 2.

74.     Based on the facts described above, there is also probable cause to believe that any cellular devices used by MAURICIO CORDERO will contain evidence relating to these crimes, including, at a minimum, WhatsApp messages with **the Targets** and the managers or victims of other similar TDA brothel locations in other U.S. cities; photographs designed for use in commercial sex advertisements; location information that could help identify other brothel locations; and contact information for individuals involved in the crimes under investigation.

75.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41, authorizing members of law enforcement, including HSI, or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to connect an extraction device and create an image of the contents of THE DEVICES for review by law enforcement, as described in Attachment B.

76.     Because this warrant seeks to image devices already in the lawful possession of law enforcement, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

77.     This investigation is wide-ranging, involves complex, international criminal conduct, and is expected to take at least several more months before case agents will be prepared to make arrests. I therefore request, in accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that

27

the warrant permit delayed notification of the execution of the warrant for 180 days, because there is probable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the owner or user of the cellular devices would seriously jeopardize the ongoing investigation by prematurely revealing its existence and potentially giving **the Targets** and their confederates an opportunity to flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

28

## <u>**ATTACHMENT A**</u>

*Property to Be Searched*

      The property to be searched consists of two cellular phones presently securely stored in the evidence processing room of HSI's Milwaukee Field Office located at 790 N. Milwaukee Street, #600 in Milwaukee, Wisconsin. Those devices are described more particularly as:

a. A pink iPhone with the cellular number XXX-XXX-5375 and the username "Sam Rodriguez;" and

b. A blue iPhone with cellular phone number XXX-XXX-2299 and the username "Samantha Casilla."

*Property to be Seized*

All evidence, instrumentalities, information, records, and contraband relating to violations of Title 18, United States Code, Section 2421(a) (interstate transportation for prostitution); Sections 1591(a)(1) and (b)(1) (Sex Trafficking by Force, Fraud or Coercion); Title 8, United States Code, Sections 1324(a)(1)(A)(ii)-(iii) and (B)(i) (transportation and/or harboring of aliens for financial gain); and Title 8, United States Code, Section 1328 (important of aliens for an immoral purpose), including but not limited to:

1. Electronic communications, including text messages, instant messaging applications (such as WhatsApp); audio or video-recorded messages; emails; and other forms of written messages concerning prostitution, sex trafficking, alien smuggling, harboring or transportation, and/or any targets, potential victims or potential co-conspirators of the crimes under investigation;

2. All images or videos relating to advertisements for or communications about commercial sex acts, or of potential victims of sex trafficking;

3. Any GPS location information and/or data from maps applications that will indicate the user's location during the dates under investigation, the user's presence at any of the locations under investigation, and any other affiliated prostitution venues elsewhere;

4. All call logs;

5. All contact lists, to assist with the interpretation of the communications documented in the call logs and text messages; and

6. All evidence of user attribution, showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, notes, documents and Internet browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.